## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GB GROUP, LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>AMERICAN TRANSPORTATION<br>GROUP INSURANCE RISK<br>RETENTION GROUP, INC.,<br><br>　　　and<br><br>PALMETTO CONSULTING OF<br>COLUMBIA, LLC,<br><br>　　　and<br><br>MICHAEL DAVID HUNTER,<br><br>　　　and<br><br>MATTHEW ALAN HOLYCROSS,<br><br>　　　　　Defendants. | **Civil Action No. 2:21-cv-03163-CDJ** |

## <u>FIRST AMENDED VERIFIED COMPLAINT</u>

Plaintiff, GB Group, LLC ("Plaintiff" or "GB Group"), by and through its undersigned counsel, Fox Rothschild LLP, hereby brings this action against Defendants, American Transportation Group Insurance Risk Retention Group, Inc. ("ATGI"), Palmetto Consulting of Columbia, LLC ("Palmetto Consulting"), Michael David Hunter ("Hunter"), and Matthew Alan Holycross ("Holycross") (Palmetto Consulting, Hunter, and Holycross shall be referred to collectively as "Palmetto Defendants") (ATGI and Palmetto Defendants shall be referred to together as "Defendants"), and states, for its First Amended Verified Complaint, as follows:

## NATURE OF ACTION

1.      This action stems from material breach of the terms of a Service Agreement dated as of July 2, 2018, as later amended, assigned, or otherwise modified (the "Agreement"), entered into by and between GB Group and ATGI,[1] Defendants' refusal to pay GB Group, and Defendants refusal to provide GB Group with the information necessary to confirm the total amounts due and owing to GB Group under the Agreement, which total hundreds of thousands of dollars.

## PARTIES

2.      GB Group, a Pennsylvania limited liability company with an address at 9925 Bustleton Ave., #51414, Philadelphia, Pennsylvania 19115, is a claims and risk management company specializing in providing third party administration services in property and casualty. The sole member and owner of GB Group is Gene Brodsky, who resides at 1254 Gantt Drive, Huntingdon Valley, Pennsylvania 19006.

3.      ATGI is a North Carolina corporation with an address at 555 Fayetteville St., Suite 201, Raleigh, North Carolina 27601, and a registered address at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615.  According to its website, ATGI was formed in 2018 to service the insurance needs of the small and independent commercial trucking industry.

4.      Palmetto Consulting, a South Carolina limited liability company with an address at 7320 Broad River Road, Suite  K-248, Irmo, South Carolina 29063, and a registered address at 317 Ruth Vista Road, Lexington, South Carolina 29073, serves as the "captive manager" of, and provides a variety of essential services for, ATGI.  Upon information and belief, none of its members are citizens of Pennsylvania.

---

[1]      Except as otherwise defined herein, all capitalized terms used in the First Amended Verified Complaint shall have the meaning ascribed to them in the Agreement.

5.      Upon information and belief, Hunter is an adult individual who resides at 1150 Libby Ariail Circle, Chapin, South Carolina 29036, and is a principal and owner of Palmetto Consulting and the president/secretary of ATGI.

6.      Upon information and belief, Holycross is an adult individual who resides at 3818 Bloomwood Road, Columbia, South Carolina 29205, and serves as a manager and owner of Palmetto Consulting and the treasurer of ATGI.

<u>JURISDICTION AND VENUE</u>

7.      As provided for in 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over this dispute because it arises between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      As provided for in 28 U.S.C. § 1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions giving rise to GB Group's claims occurred in this judicial district.

9.      This Court has personal jurisdiction over Defendants because (i) ATGI has systemic and continuous business contacts with this forum, and/or has purposefully directed its activities at residents of this forum, (ii) Palmetto Consulting acts as the "captive manager" of ATGI and has systemic and continuous business contacts with this forum, and/or has purposefully directed its activities at residents of this forum, (iii) Hunter and Holycross have purposefully directed their activities at residents—including GB Group—of this forum in connection with certain unrelated business and investment opportunities, and (iv) the Palmetto Defendants' alter ego and/or single enterprise relationship (described below) with ATGI, their domination and control of ATGI, and their direct involvement with the Agreement between ATGI and GB Group.

## STATEMENT OF FACTS

**A.    ATGI Materially Breaches the Agreement**

10.    Pursuant to the Fee Schedule attached to the Agreement as Exhibit I and later amended by way of an Addendum to Service Agreement executed by the parties on April 14, 2020 (the "Addendum"), ATGI agreed to pay GB Group certain service fees as set forth therein in exchange for GB Group providing certain policy, risk management, claims administration, and database application services.

11.    A true and correct copy of the Agreement entered into by and between GB Group and ATGI is attached hereto as **Exhibit 1** and is incorporated herein by reference in its entirety.

12.    A true and correct copy of the Addendum entered into by and between GB Group and ATGI is attached hereto as **Exhibit 2** and is incorporated herein by reference in its entirety.

13.    Pursuant to Article III(A) and (B) of the Agreement, ATGI (the "Client") agreed to "[r]eport all claims received during the term of the Agreement to the Service Company [GB Group]," and to "[c]ooperate in the investigation and resolution of each claim."

14.    Pursuant to Article III(F) of the Agreement, ATGI agreed to "[p]ay all service fee invoices within 30 days of receipt unless a trust fund is established whereby the fees will be deducted automatically," and that "[a]ll disputed service invoices must be reported to [GB Group] within 15 days of receipt for resolution."

15.    Article IV of the Agreement provides that ATGI "agrees to pay [GB Group] for services rendered for each insurance policy term under the Fee Schedule attached as Exhibit I," and "agrees to pay all allocated loss adjustment expenses as defined in the Fee Schedule, including applicable sales tax."

16.     Article VI of the Agreement provides, in relevant part, that GB Group is also entitled to recover its reasonable attorneys' fees and costs that are incurred as a "direct or indirect result of any misconduct, error, or omission" of ATGI or any of its directors, officers, agents, employees, subsidiaries or affiliates, in connection with the furtherance or performance of any provision of this Agreement[.]"

17.     Both Exhibit I to the Agreement and the Addendum include service fees to be calculated based on a percentage of Gross Written Premium ("GWP") written by ATGI, which is to be calculated at the end of each month, with fees to be paid by the fifth of the following month.

18.     Section 3 of the Addendum provides that the new service fees are based on the new minimum premiums, which are set forth in a chart.

19.     Section 5 of the Addendum also confirms that GB Group's services are provided based on a "Cradle to Grave" basis.

20.     ATGI has willfully and materially breached the Agreement and Addendum due to, *inter alia*, its failure to (a) timely pay all of GB Group's service fees pursuant to the Agreement and Addendum, and (b) provide GB Group with the necessary information to determine the GWP, which serves as the basis in calculating service fees due and owing to GB Group.

21.     ATGI also breached the Agreement and Addendum by failing to charge the new minimum premiums that were agreed upon in the Addendum. For example, while California's minimum premium is $12,500 per unit, ATGI is charging as little as $8,000 per unit, to the detriment of GB Group.

22.     GB Group is entitled to attorneys' fees, as well as punitive damages based on ATGI's conduct is willful, outrageous, oppressive, and malicious, and shows a reckless indifference to the rights of GB Group.[2]

**B.     The Palmetto Defendants Domination and Control of ATGI**

23.     Palmetto Consulting serves as the "captive management company" or the "captive manager" of ATGI and, upon information belief, provides many essential services for ATGI including, but not limited to, accounting and payout services to vendors (including GB Group).

24.     With Palmetto Consulting managing ATGI, ATGI essentially functions as mere instrumentality of Palmetto Consulting and/or the companies are functioning as a single enterprise.[3]

25.     Moreover, Palmetto Consulting and ATGI share common principal corporate officers, as they are both controlled and operated by Hunter and Holycross.

26.     The Palmetto Defendants have complete domination and control over ATGI, and make its key business and financial decisions, including which vendors to pay (or not).

27.     Such control has been used by the Palmetto Defendants to commit wrongs and the dishonest and unjust acts described above in contravention of GB Group's legal rights.

28.     ATGI's bad acts have also been carried out by Palmetto Defendants and, therefore, all named Defendants should be held jointly and severally liable for the unlawful actions of ATGI.

---

[2]     Article VII(K) of the Agreement provides that the laws of the State of North Carolina apply. Under North Carolina law, "[g]enerally, punitive damages are not recoverable for breach of contract, except for a breach of a contract to marry. However, when the breach is accompanied by identifiable tortious conduct and by some element of aggravation, punitive damages may be available. This is true even if the tort constitutes or accompanies a breach of contract. 'Aggravation' has been defined to include fraud, malice, such a degree of negligence as indicates a reckless indifference to plaintiff's rights, oppression, insult, rudeness, caprice, and willfulness." *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 305 (1993) (internal citations omitted).

[3]     "[T]he result of finding a corporation to be a mere instrumentality of another is that the two are treated as one for purposes of assessing liability for the alleged wrong, and are jointly and severally liable." *Muse v. Charter Hosp. of Winston-Salem, Inc.*, 117 N.C. App. 468, 473 (1995).

29.    Punitive damages should also be imposed because the conduct of the Palmetto Defendants is willful, outrageous, oppressive, and malicious, and shows a reckless indifference to the rights of GB Group.

**C.    The Corporate Veil Should be Pierced to Impose Liability on the Palmetto Defendants**

30.    Based on the theories of instrumentality, alter ego, and/or single enterprise liability, the Palmetto Defendants should be held liable for the breach of the Agreement and the wrongs committed by ATGI set forth above.

31.    Palmetto Consulting and ATGI are both controlled operated by Hunter and Holycross.

32.    With Palmetto Consulting managing ATGI, ATGI essentially functions as mere instrumentality of Palmetto Consulting and/or the companies are functioning as a single enterprise.

33.    All of the Defendant have integrated their resources and operation to achieve a common business purpose.

34.    In addition, all of the Defendants have acted in cooperation to deprive GB Group of its their rights to be fully compensated for its services.

35.    Upon information and belief, ATGI is inadequately capitalized, does not have assets sufficient to meet anticipated debts, claims, or damages, and has even contemplated filing for bankruptcy.

36.    Upon information and belief, Hunter and Holycross control and operate both ATGI and Palmetto Consulting and treat them as a single entity, do not distinguish and separate their roles and duties for each, and completely disregarded corporate formalities.

37.     Hunter and Holycross use ATGI and Palmetto Consulting to fund their large salaries rather than timely paying amounts due and owing to vendors, including GB Group's service fees pursuant to the subject Agreement.

38.     Accordingly, the corporate veil should be pierced to impose liability on the Palmetto Defendants for their unlawful actions.

**COUNT I**
**Breach of Contract**
**<u>(Against All Defendants)</u>**

39.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

40.     GB Group and ATGI are parties to the Agreement and Addendum, which govern the rights, duties, and obligations of the parties.

41.     GB Group has performed all of its obligations under the Agreement and Addendum.

42.     As set forth above, ATGI has willfully and materially breached the Agreement and Addendum due to, *inter alia*, its failure to (a) timely pay all of GB Group's service fees pursuant to the Agreement and Addendum, and (b) provide GB Group with the necessary information to determine the GWP, which serves as the basis in calculating service fees due and owing to GB Group.

43.     As set forth above, ATGI is mere instrumentality of Palmetto Consulting or they are part of a single enterprise.  Accordingly, Palmetto Consulting should be held liable for the breach of the Agreement and the wrongs committed by ATGI.

44.     As set forth above, the corporate veil should be pierced to impose liability on Hunter and Holycross, individually, for the breach of the Agreement and the wrongs committed by ATGI.

45.     As a result thereof, GB Group has sustained substantial money damages to which it is entitled to recover against all Defendants.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing
#### (Against All Defendants)

46.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

47.     Like all agreements formed under North Carolina law, the Agreement and Addendum contain an implied covenant of good faith and fair dealing.

48.     North Carolina law is clear that the implied covenant of good faith and fair dealing provides that each party to a contractual relationship will not do anything that will deprive the other party of the benefits of its bargain, and a breach of this duty gives rise to an action for damages.

49.     As set forth above, ATGI has willfully and materially breached the Agreement and Addendum due to, *inter alia*, its failure to (a) timely pay all of GB Group's service fees pursuant to the Agreement and Addendum, and (b) provide GB Group with the necessary information to determine the GWP, which serves as the basis in calculating service fees due and owing to GB Group.

50.     As set forth above, ATGI is an instrumentality of Palmetto Consulting or they are part of a single enterprise.  Accordingly, Palmetto Consulting should be held liable for the breach of the Agreement and the wrongs committed by ATGI.

51.     As set forth above, the corporate veil should be pierced to impose liability on Hunter and Holycross, individually, for the breach of the Agreement and the wrongs committed by ATGI.

52.     As a result thereof, GB Group has sustained substantial money damages to which it is entitled to recover against all Defendants.

53.     Retention of the benefits bestowed upon Defendants without providing enumeration to GB Group would be unjust.

## COUNT IV
### Request for Accounting
### (Against All Defendants)

54.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

55.     As set forth above, GB Group's service fees are calculated based on a percentage of GWP written by ATGI.

56.     Defendants refuse to provide GB Group with the information necessary to confirm GWP and, as a result, the total amounts due and owing to GB Group under the Agreement and Addendum, which total hundreds of thousands of dollars based upon information available to date.

57.     Defendants have a duty and obligation to provide this information in order for GB Group to collect all service fees owed under the Agreement and Addendum.

58.     Accordingly, GB Group is entitled to this information, and a full accounting to determine GWP and all amounts past due and owing to GB Group under the Agreement and Addendum is necessary.

## COUNT V
### Corporate Veil Piercing
### (Against All Defendants)

59.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

10

60.     Hunter and Holycross control both ATGI and Palmetto Consulting and treat them as a single entity, do not distinguish and separate their roles and duties for each, and disregard corporate formalities.

61.     Hunter and Holycross use their control of ATGI and Palmetto Consulting to achieve a common business purpose, as well as to deprive GB Group of its their rights to be fully compensated for its services.

62.     Hunter and Holycross own and operate both Palmetto Consulting and ATGI. Palmetto Consulting exercises actual control over ATGI and operates ATGI as a mere instrumentality or tool.

63.     ATGI is mere instrumentality of Palmetto Consulting or they are part of a single enterprise.  Accordingly, Palmetto Consulting should be held liable for the breach of the Agreement and the wrongs committed by ATGI.

64.     The corporate veil should be pierced to impose liability on Hunter and Holycross, individually, for the breach of the Agreement and the wrongs committed by ATGI.

**COUNT III**
**Alternatively,**
**Unjust Enrichment**
**(Against All Defendants)[4]**

65.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

---

[4]     "Plaintiffs are permitted by the Federal Rules of Civil Procedure to plead alternative claims regardless of their consistency." *Schirmer v. Principal Life Ins. Co.*, No. 08-CV-2406, 2008 WL 4787568, at *4 (E.D. Pa. Oct. 29, 2008).  *See also, Khawaja v. RE/MAX Cent.*, 2016 PA Super 261, 151 A.3d 626, 633 (2016) (holding breach of contract may be pleaded alternatively with a claim of unjust enrichment if the claims are raised in separate counts of a complaint) (citing *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. 2009)).

66.     As set forth above, GB Group has performed significant services for the benefit of ATGI to which GB Group has not been compensated.

67.     The Palmetto Defendants also benefited from the services performed by GB Group.

68.     The Palmetto Defendants did not enter into a contract with the GB Group.

69.     The Palmetto Defendants did not compensate GB Group for the benefits they received.

70.     As a result thereof, Defendants have been unjustly enriched at the expense and detriment of GB Group.

## COUNT VI
## Alternatively,
## Civil Conspiracy
## (Against All Defendants)

71.     Plaintiff repeats and realleges all of the foregoing paragraphs as if set forth at length herein.

72.     Defendants have acted in combination with one another with a common purpose of depriving creditors such as GB Group of their rights to be fully compensated for their services.

73.     Defendants have taken overt acts in furtherance of the aforesaid common purpose of depriving creditors such as GB Group of their rights to be fully compensated for their services.

74.     As a direct and proximate result of the overt acts and common purpose of Defendants, GB Group has suffered damages as more fully set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, as follows:

A.      Awarding Plaintiff monetary damages arising from Defendants' breaches and violations of Plaintiff's rights in an amount to be proven at trial;

B.      A full accounting to determine all amounts past due and owing to GB Group under the Agreement and Addendum;

C.      Awarding Plaintiff its reasonable attorneys' fees and costs, as provided for in Article VI of the Agreement;

D.      Imposing punitive damages against Defendants; and

E.      Awarding Plaintiff such further or different relief as this Court deems just and appropriate.


                                        **FOX ROTHSCHILD LLP**

Dated: October 15, 2021                 */s/ Brett A. Berman*
                                        Brett A. Berman, Esquire
                                        Andrew S. Console, Esquire
                                        Identification Nos. 204843/313856
                                        2000 Market Street, 20th Floor
                                        Philadelphia, PA 19103
                                        Phone: (215) 299-2000
                                        Fax:    (215) 299-2150
                                        Email: bberman@foxrothschild.com
                                                aconsole@foxrothschild.com

                                        *Attorneys for Plaintiff,*
                                        *GB Group, LLC*

# Exhibit 1

# GB Group, LLC

# SERVICE AGREEMENT

This Agreement, made as of the 2[th] day of July, 2018, between GB Group, LLC, hereafter referred to as "Service Company" and AMERICAN TRANSPORTATION GROUP INSURANCE RISK RETENTION GROUP, INC., hereafter referred to as "the Client".

WHEREAS, the Service Company operates a business that provides policy services, risk management, claims administration services and database application; and Client operates a Risk Retention Group.

WHEREAS, the Client has requested that the Service Company perform certain services on its behalf with respect to policy service, risk and claims management on the terms set forth below,

NOW THEREFORE, in consideration of the foregoing mutual promises the parties hereby agree:

## ARTICLE I

*Term of Agreement*

This Agreement shall commence on 2nd day of July, 2018, and ending 31st day of December, 2021. An automatic renewal for a two year term will remain in force, thereafter, with the affirmative approval of a majority of the Board of Directors of the Company, or until amended or cancelled as provided in the cancellation clause.

## ARTICLE II

*Service Company Agrees To:*

A. Manage all claims by all persons or corporations submitted by the Client to the Service Company during the term of the Agreement.
B. Conduct an investigation of facts and damages pertaining to such claims.
C. Establish and maintain appropriate reserves on each claim and within policy limits, as endorsed on the insurance policy.
D. Maintain a separate file for each claimant, which shall be available for review by the Client at any reasonable time, and which is deemed the property of the Client.
E. Recommend settlement or denial of all claims to the Client and negotiate settlement pursuant to authority granted by the Client, and/or reinsurer if applicable.
F. Perform all reasonable and necessary administrative and clerical work in conjunction with each claim, including the preparation and execution of payments, release agreements and other documents necessary to process a claim.
G. Coordinate all litigation activity with designated outside legal counsel, as approved by the Client.
H. Notify any and all reinsurer if applicable of any claim evaluated to be reportable under the insurance carrier's policy limits and catastrophic reporting guidelines.
I. Notify the Client immediately upon receipt of a complaint from any governmental agency applicable to a claim being handled under Client's policy.
J. Provide loss run reports during the term of this Agreement, which includes electronic access to reports via the Internet.
K. Manage the Client's loss trust fund account for payment of claims, allocated loss expenses and service fees under standard accounting G.A.A.P. rules along with:
   a. Signature authority will be limited to Service Company Managers.
   b. Expenditures greater than $50,000 must have prior Client authorization prior to disbursement.
   c. Access to monthly transaction reconciliation reports or supply Client with actual reports as requested.

L. Claims consulting in accessing risk and claims management of new risk.

M. Maintain the following insurance coverages during the term of the Agreement:
    a. Professional Liability Policy for Claims Adjustment with a limit of $1,000,000 and 1 year renewal or tail policy after termination or expiration of contract.
    b. General Liability Policy with a limit of $1,000,000 combined single limit

N. Provide secure storage for files during the term of the Agreement. Files will be returned to the Client after the contract is terminated at the Client's expense or incur other fees for storage charges.

## ARTICLE III

*The Client Agrees To:*

A. Report all claims received during the term of the Agreement to the Service Company.
B. Cooperate in the investigation and resolution of each claim.
C. Grant the Service Company minimum settlement and reserve authority on all claims reported within policy limits.
D. Provide reinsurer, if applicable, with insurance carrier information and claim reporting guidelines under each policy.
E. Notify Service Company of any broker representation change, in writing within 30 days.
F. Pay all service fee invoices within 30 days of receipt unless a trust fund is established whereby the fees will be deducted automatically. All disputed service invoices must be reported to the Service Company within 15 days of receipt for resolution.
G. Notify Service Company of any insurance policy cancellation requested by the Client or issued by the insurance company.
H. Notify Service Company of any adverse business events such as mergers, acquisitions, receivership, liquidation or bankruptcy filings.
I. Agrees not to solicit and not to hire any of Service Company employees during the term of the contract and for three years after the termination date. In the event the Client hires any Service Company employees, during the term hereof or within 36 months of termination thereof, the Client agrees to pay GB Group an amount equal to 200% of employee's gross annual salary at the point the Client hires the employee. The Client agrees that the amount payable for hiring an employee is a reasonable forecast of the probable harm to the Servicing Company and that the amount is not a penalty.

## ARTICLE IV

The Client agrees to pay the Service Company for services rendered for each insurance policy term under the Fee Schedule attached as **Exhibit I**. Client agrees to pay all allocated loss adjustment expenses as defined in the Fee Schedule, including applicable sales tax.

## ARTICLE V

Electronic Claims Information Access means those electronic claim records of the Service Company with respect to claims by or against the Client, which are designed by the Service Company for access by the Client.

The Service Company desired to enhance service by providing the Client with electronic Access to Claim Records and reports. The Client desires to improve efficiency in its claim handling and monitoring by virtue of such access. Electronic claim records contain information that is proprietary and confidential as to the Service Company, the Client, the claimant and associated entities and/or persons. By executing this Agreement, the Client expressly acknowledges that: (1) information in Electronic Claim Records is confidential, (2) improper disclosure of confidential information to unauthorized person or entities is prohibited and may result in legal liability to the Client, and (3) in accessing and handling electronic claim records the Client will comply with the terms and conditions set forth, under Article V.

_The Service Company and the Client therefore agree as follows:_

A.   The Service Company shall provide the Client with Electronic Access through a secure Internet access website using a login and password configuration.

B.   The Client authorizes the Service Company to provide the Client with electronic Access to Electronic Claim Records as set forth under Article V.

C.   The Client acknowledges that the Electronic Claim Records contain information that is proprietary and confidential to the Service Company, the Client, the claimant and other parties associated with each claim file.

D.   The Service Company agrees to maintain the confidentiality of the Electronic Claim Records and to disclose information contained in the Electronic Claim Records, only to those employees, agents, and/or other authorized persons or entities directly involved in the handling or monitoring of the claim or claim activity. The Client agrees that such disclosure shall be restricted to the purpose of handling or monitoring the claim or claim activity, and such Electronic Claim Records and information shall not be used for any other purpose.

E.   The Client agrees to submit a list of all persons for whom access is permitted to the Service Company; to notify the Service Company immediately in writing if any person is no longer entitled to access; and to review and verify listings periodically provided by the Service Company of all such persons for compliance.

F.   The Client agrees that it will inform, prior to disclosure, any person to whom the Client discloses information from the Electronic Claim Records that: (1) the information is confidential, and (2) that disclosure and use of the information is restricted as set forth in this Authorization. The Client will obtain the agreement of all such persons to comply with the guidelines set forth in this Authorization before disclosing any information from Electronic Claim Records.

G.   The Client agrees and acknowledges letting the Managing General Underwriter access and view claims information and electronic claims records during the terms of this agreement unless access is denied in writing.

H.   The Client agrees and acknowledges that access to view claims information and electronic claims records, as they pertain to this agreement, will be provided for audit and review by the Commissioner of Insurance of the State of North Carolina (the "Commissioner").

I.   "Confidential Information", as used herein, shall mean any materials data, information, and documents disclosed by either party or their affiliates, (whether transmitted orally, in writing, or through any electronic medium) or generated in connection with the services of this Agreement which relate to the business, business activities, business operations, customer data or proprietary trade secrets. Confidential Information may include, but not to be limited to, (i) trade secrets and work product, (ii) information relating to business plans, sales, pricing, financial data, or marketing plans or methods, (iii) software, applications, the systems, including source code, object code and documentation and commentary related thereto, (iv) information relating to one or more customers, including, but not limited to: (a) personal information such as a customer's name, address, telephone number, account relationships, account numbers, account balances, and account histories; (b) information, concerning such customer which would be considered "non-public personal information" within the meaning of title V of the Gramm-Leach Bliley Act of

1999 (public Law 106-102, 113 Stat. 1338) and its implementing regulations, as the same may be amended from time to time; (c) information concerning such customers which would be considered "individually identifiable health information" within the meaning of the Health Insurance Portability and Accountability Act; and (d) information concerning such customers which is protected from disclosure by other applicable federal or state laws and regulations regarding privacy; (e) confidential information of third parties in either party's possession, and (f) security procedures and measures (collectively and separately the "Confidential Information"). Confidential Information shall remain the property of the disclosing party and the recipient shall not be deemed by virtue of this Agreement or by an access to Confidential Information to have acquired any right or interest of any kind in or to any such Confidential Information. Each party represents and warrants that it shall not use the other party's Confidential Information for its benefit, nor shall it disclose Confidential Information to any third parties, other than persons specifically authorized in writing, or as may be required by order of a court of competent jurisdiction, a governmental agency or by operation of law. Notwithstanding the foregoing, "Confidential Information" shall not include information, which is disclosed to a party by third parties not under a confidentiality obligation, or information, which is public information, or information known by a party prior to the effective date of this Agreement and for which such party is not under a separate confidentiality obligation.

## ARTICLE VI

_Indemnification:_

The Client agrees that it will indemnify and hold harmless the Service Company and its directors, officers, employees, subsidiaries, shareholders and affiliates from and against any and all claims, loss, liability, costs, damages, and reasonable attorney's fees incurred by the Service Company as the direct or indirect result of any misconduct, error or omission of the Client or any of the Client's directors, officers, agents, employees, subsidiaries or affiliates, in connection with the furtherance or performance of any provision of this Agreement, or as a result of instructions given by the Client to the Service Company, which the latter follows, provided that said claims, losses, liability costs, damages and reasonable attorney's fees have not been directly caused by any misconduct, error or omission by the Service Company, its directors, officers, employees, subsidiaries and affiliates.

## ARTICLE VII

_The Parties Agree That:_

A. Either party may terminate this Agreement, without cause, by giving at least 60 days prior written notice of termination to the other party prior to the renewal of the contract, under the notice provision. Prior notice must be given to the Commissioner for the termination of this Agreement.
B. Upon termination of this Agreement, the Client and the Service Company have the option to negotiate terms and conditions of a run-off service agreement, including the storage and maintenance of closed files.
C. With respect to any claims that are open or policies active on the date of termination and which are not subject to a run-off service agreement, the Service Company shall return all such files to the Client within 30 business days following the date of termination.
D. Article V above and any other indemnification provisions of this agreement are continuing, absolute, and unconditional obligations of the parties and shall survive the termination of this Agreement.

E. The Service Company and its agents and employees, in the performance of this Agreement, shall act in an independent capacity and not as officers, employees, or agents of the Client.

F. No assignment of this agreement, or any rights or interest arising hereunder, shall be valid without express written approval of each party. Prior notice must be given to the Commissioner for the assignment of authority under the agreement

G. The Client and its agents and employees, in the performance of this Agreement, shall act in an independent capacity and not as officers, employees, or agents of the Service Company.

H. Service Company and Client mutually agree to allow for the company names to be used for extended marketing efforts unless otherwise instructed not to.

I. The parties acknowledge that any and all escheat and unclaimed property obligation of any type or variety lie with the Client and not the Service Company. Pursuant to the other terms and conditions of this Agreement, the Service Company shall provide the Client with such information and reports as reasonably required by the Client to perform this function.

J. Any and all notices or demands (collectively, "Notices") given pursuant to this Agreement, or required by law to be given by one party to the other in connection with the services described herein, shall be given or served in writing by means of (1) personal delivery (which shall include delivery by overnight courier service)) or (2) deposit in the U.S. mail, certified or registered mail, with first class postage prepaid. Notices sent by mail shall be deemed given on the third business day following deposit in the U.S. mail as specified above. Unless otherwise specified in this Agreement, Notices shall be given to the parties at the address, and to the attention of the individuals, that are set forth below as the receiving party's "Name & Address for Notices." Each party shall promptly notify the other parties of any change in address in the manner set forth above.

*Name and Address for Notices:*

| Company | Contact Account |
|---|---|
| GB Group, LLC | Gene Brodsky, President PO Box 51414 Philadelphia, PA 19115 |
| AMERICAN TRANSPORTATION GROUP INSURANCE RISK RETENTION GROUP, INC. | 555 Fayetteville St., Ste 201 Raleigh, NC 27601 |

K. The validity of this Agreement, the construction and enforcement of its terms, and the interpretation of the rights and duties of the parties shall be governed by the laws of the State of North Carolina. This agreement constitutes the whole and entire Agreement between the parties and thus supersedes all prior oral and written agreements.

L. Any amendments to this contract must be done in writing and signed by both parties with express reference to this agreement. Prior approval must be obtained from the Commissioner for any amendments to the agreement.

M. This agreement is subject to the Commissioner's approval to appoint GB Group, LLC as Servicing Company for the Client.

IN WITNESS WHEREOF, the parties have caused the Agreement to be executed by the persons duly authorized as of the date written above.

**GB GROUP, LLC**

By:      Gene Brodsky

         _____

(Print or type name and title)

Signature:    *Gene Brodsky*

         27D9E7D02134404...

Date:      2018-08-02


**AMERICAN TRANSPORTATION GROUP INSURANCE RISK RETENTION GROUP, INC.**

By:      Eleazar Rojas

         _____

(Print or type name and title)

Signature:    *Eleazar Rojas*

         09CF3798AC894F0...

Date:      2018-08-02


**Attachments: Exhibit I: Fee Schedule**

# Exhibit I:  Fee Schedule 2018 - 2021

A. Client Name:            AMERICAN TRANSPORTATION GROUP INSURANCE
                                RISK RETENTION GROUP, INC.

B. Contract Term:        3 year, automatic renewal if not cancelled 120 days
                                in advance of termination date

C. Type:                        Trucking Claims Services

| Feature Type: | Fee | Description |
|---|---|---|
| Policy Service, Risk and Claims Management, database access with reporting server. | Inception to 12/31/2019 - 6.75% of Gross Written Premium (GWP), 1/1/2020-12/31/2021 – 7.75% of Gross Written Premium (GWP) for accident frequency of claims to vehicles not exceed 25% (i.e. 25 accident per 100 units). For frequency of over 25%, an additional per claim file fee of $800 will be assessed. | GWP to be calculated at the end of each month. Fees are to be paid by 5th of the following month. |
| Allocated Loss Adjustment Expenses | Time and Expenses | Use of outside vendors and/or services to be billed at outside vendor rates. Reimbursement for transportation $0.56 per mile. |
| Claims Management Expenses | Net Cost charged by the vendor/subcontractor: Public Record Fees, Appraisers, Defense Attorneys, Private Investigators/Surveillance and etc. | |
| Subrogation Services | 15% of net recovered. | |
| Audit | Net Cost | Any and all audits, requested by the client, state, department of insurance or any governmental agency. Any and all expenses incurred, such as hiring independent professionals or contractors and any expenses associated. |

Exhibit 2

# Addendum to Service Agreement

Upon mutual agreement between American Transportation Group, RRG (Client) and GB Group, LLC (Service Provider), "Service Agreement" signed on 08/02/2018 is amended to reflect the following changes:

1. Service Provider's fees are temporary reduced to 4% of gross premium written by the Client, for the policies written from March 01, 2020 to February 28, 2021.

2. Service Provider's fees are reduced to 4.5% of gross premium written by the Client, for the policies written after February 28, 2021.

3. New Service Fees are based on new minimum premiums as following:

| | |
|---|---|
| Alabama $12,500 | Minnesota $12,500 |
| Arizona $12,500 | North Carolina $12,500 |
| California $12,500 | New Jersey $15,000; |
| Florida $16,000 | Nevada $12,500 |
| Georgia $12,500 | Ohio $12,500 |
| Illinois $12,500 | Pennsylvania $12,500 |
| Kentucky $12,500 | South Carolina $12,500 |
| Louisiana $12,500 | Tennessee $12,500 |
| Maryland $12,500 | Texas $12,500 |
| Michigan $12,500 | Virginia $12,500 |
| Missouri $12,500 | Washington $12,500 |

4. This addendum does not modify terms of the Service Agreement for policies written and renewed prior to March 01, 2020.
5. This addendum further clarifies that services are provided based on "Cradle to Grave" basis.

IN WITNESS WHEREOF, the parties have caused the Addendum to be executed and delivered by persons duly authorized of the date written below.

**American Transportation Group, RRG**

_Michael O. Hunter_      _President_

Print Name                 Title

_Michael O. H_      _4/14/20_

Signature                   Date

**GB Group, LLC**

Gene Brodsky      President

Print Name                 Title

                   04/14/2020

Signature                   Date

## **VERIFICATION**

I, Gene Brodsky, am authorized to submit this verification on behalf of Plaintiff, GB Group, LLC.  I verify that I have read the foregoing First Amended Verified Complaint, which has been drafted with the assistance of counsel.  The factual statements contained therein are true and correct to the best of my knowledge, information, and belief.  I understand that this statement is made subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities, which provides that if I make knowingly false statements, I may be subject to criminal penalties.


_____
Gene Brodsky

Dated:  October 15 , 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2021, a true and accurate copy of the foregoing First Amended Complaint served on counsel of record electronically via the Court's Electronic Case Filing system.

Dated: October 15, 2021                                                 */s/ Brett A. Berman*
                                                                                        Brett A. Berman, Esquire